Todd R. Johnston, OSB 992913
tjohnston@hershnerhunter.com
Hershner Hunter, LLP
675 Oak Street, Suite 400
Eugene, OR 97440-1475
Telephone: (541) 686-8511

Of Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DISTRICT

| | |
|---|---|
| PMM HOLDINGS, LLC, and PRECISION MACHINE AND MANUFACTURING, INC.; | Case No.   6:26-cv-1394 |
| Plaintiffs, | COMPLAINT |
| v. | (Breach of NDA; Misappropriation of Trade Secrets; Tortious Interference with Contract; Intentional Interference with Prospective Economic Relations; Fraud) |
| WILLIAM W. MEYER AND SONS, INC.; | |
| Defendant. | |
| | Demand for Jury Trial |

Plaintiffs allege:

Plaintiffs PMM Holdings, LLC ("PMM Holdings") and Precision Machine and Manufacturing, Inc. ("Precision"), referred to together in this Complaint as "Precision" or "Plaintiffs," allege against Defendant Willliam W. Meyer and Sons, Inc. ("Meyer" or "Defendant") as follows:

### JURISDICTION AND VENUE

1.    The U.S. District Court for the Eugene District of Oregon has subject matter jurisdiction over the claims in this case because Plaintiffs' principal place of business is in Eugene,

COMPLAINT – Page 1 of 14

Oregon, the controversy is between citizens of different states and the amount in controversy exceeds $75,000.

2.    The Court also has subject matter jurisdiction because Plaintiffs state claims including claims under federal laws which confer federal question subject matter jurisdiction on the Court including the Defend Trade Secrets Act 18 U.S.C. § 1836, the Sherman Act.

3.    The Court has specific personal jurisdiction over Defendant because it availed itself of the benefits of the State of Oregon in doing business within the state and caused injury to Plaintiffs within the state, including breaches of contract and wrongful, unlawful acts damaging PMM Holdings and its wholly-owned subsidiary, Precision. Further, the parties' contract, Defendant's breach of which is at issue in this case, states that proceedings may be brought, "in the courts of the State in which [Precision's] principal place of business is located and within the metropolitan area nearest such place of business[.]"- which is Eugene, Oregon.

## PARTIES AND THEIR AGENTS

4.    Plaintiff PMM Holdings is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Sacramento, California. PMM Holdings owns 100% of the shares of Precision.

5.    Plaintiff Precision is a corporation organized and existing under the laws of the State of Oregon and is the wholly-owned subsidiary of PMM Holdings.

6.    Defendant William W. Meyer and Sons, Inc. is registered with the Secretary of State of Illinois as a for-profit corporation organized under the laws of Illinois as entity file number 28858990. Meyer operates from its principal office at 1700 Franklin Boulevard, Libertyville, Illinois, but does business nationally and globally, including, but not limited to, in the states of

COMPLAINT – Page 2 of 14

Oregon and California, under the assumed or fictious names "Meyer Made," "Meyer Industrial," and "Meyer Pro."

## FACTS COMMON TO ALL CLAIMS

7.     Plaintiffs are in the business of designing, manufacturing and selling industrial machinery, primarily heavy duty rotary airlock feeders, rotary valve airlocks and screw conveyors as components for material handling systems. To conduct such business, PMM Holdings owns Precision which performs the design, manufacture and sales of such machinery. Precision's rotary airlock feeder is a unique product, highly regarded in the industry, and particularly effective in blower truck and blower equipment applications.

8.     In May of 2024, Meyer entered into a "Confidentiality Agreement" with PMM Holdings, by and through PMM Holdings' financial advisor and representative, Crown Point Partners, LLC, in connection with Meyer's purported interest in a potential transaction with Plaintiffs. A true and accurate copy of the signed "Confidentiality Agreement," dated May 7, 2024, signed by Charles Meyer as CEO of Meyer (the "Meyer NDA"), is attached to this Complaint as Exhibit 1.

9.     The Meyer NDA included provisions by which Meyer agreed:

(a)     To "hold in confidence and trust" any and all "Confidential Information," defined as including, "without limitation, information regarding … the Company's … services, products, trade secrets, techniques, processes, operations, formulae, product specifications, know-how, compositions, inventions, discoveries, designs, sketches, drawings, [etc.] and Plaintiffs' financial data including "existing and potential customers, employees, vendors or suppliers" (Exhibit 1, Meyer NDA, p. 1, Sec. 2, "Confidential Information" and Sec. 3, "Disclosure and Use Restrictions");

COMPLAINT – Page 3 of 14

(b)     To not "disclose or otherwise provide or transfer, directly or indirectly, any Confidential Information to any third party without prior written consent of the Plaintiffs" (Exhibit 1, Meyer NDA, p. 1, Sec. 3, "Disclosure and Use Restrictions"); and

(c)     That violation of the Meyer NDA by Meyer entitles Plaintiffs to seek injunctive relief without posting a bond (Exhibit 1, Meyer NDA, p. 2, Sec. 10, "Irreparable Harm").

10.     Following execution of the Meyer NDA, Charlie Meyer, CEO of Meyer, made an inspection of Precision's facilities, guided by Precision CEO Don Lindsey, during which Mr. Lindsey provided a plethora of confidential information concerning Precision's specific feeder materials and manufacturing processes, including but not limited to the specific equipment necessary to manufacture the feeders, feeder-manufacturing workflow, work cells, fixturing, horizontal boring mill operations, robotic welding cells, material flow, assembly sequencing, and production methods and information. Meyer was also given access to Precision's price floors, product specific pricing, costs, gross profit information, margin structure, cost drivers, product-line profitability, and ability to absorb price pressure. Finally, Meyer was also given access to in-depth disclosure of Precision's overall capacity limitations, combined with the pricing strategy and monthly volume requirements that were necessary to accommodate a specific Precision customer's blower truck feeder business ("Confidential Information").  The Confidential Information provided to Meyer on site and through access to Precision's confidential data room was kept secret by Precision. The economic value of the Confidential Information was significant and made up a substantial amount of the value of Precision, which Meyer was purportedly evaluating for purchase or investment.

11.     Pursuant to the terms of the Meyer NDA, Precision disclosed this Confidential Information only for the limited purpose of the parties' evaluation of a potential purchase/sale

COMPLAINT – Page 4 of 14

transaction and did not transfer ownership, license rights, manufacturing rights, sales control rights, or any other right to copy, reverse engineer, reformat, disclose, or use any Confidential Information.

12.     Meyer breached the Meyer NDA and misappropriated Precision's Confidential Information in at least the following ways:

(a)     Meyer falsely represented to Plaintiffs that it was interested in an acquisition or investment in Precision in order to gain access to Plaintiffs' Confidential Information;

(b)     At the conclusion of the parties' discussions relating to Meyer's potential acquisition or investment in Precision, Meyer secretly copied the entire confidential data room it had been given access to;

(c)     Meyer then used the Confidential Information to design, manufacture and sell feeders to Precision's customer(s); and

(d)     Meyer also shared the Confidential Information with third parties, including customers of Precision.

13.     The misconduct of Meyer and its agents constitutes various breaches of duty, sounding in both contract and tort, including, but not limited to, breach of contract, breach of covenants of good faith and fair dealing, tortious interference with contract, intentional interference with prospective economic advantage, misappropriation of trade secrets/proprietary information trade secret, unfair competition, and fraud, all of which entitles Plaintiffs to legal and equitable relief, including but not necessarily limited to, an award of damages, which include the diminution of the value of PMM Holdings' ownership interest in Precision, disgorgement by Defendant and its agents of profits or benefits obtained from their misconduct, exemplary damages, reimbursement of attorney fees and litigation expenses incurred by Plaintiffs in

COMPLAINT – Page 5 of 14

protecting and enforcing their rights, a declaration of Plaintiffs' rights with respect to the rotary feeders, temporary restraining orders, and injunctive relief.

14.     The misconduct of Meyer is not only a breach of the Meyer NDA but is also in violation of the Sherman Act (15 U.S.C. § 1, *et seq.*), the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836), Oregon's Trade Secrets Act (ORS 646.461 *et seq.*) and has caused economic loss, damage and harm which is ongoing and in an amount to be proven at trial.

15.     The misappropriation of Precision's design, manufacturing processes, intellectual property, proprietary and/or other Confidential Information associated with Precision's airlock rotary feeders was intentional and has caused, continues to cause, and will continue to cause Plaintiffs irreparable harm, including by illegally competing with Precision and wrongfully excluding Precision from a large segment of the feeder market such that damages will not constitute adequate relief.   Plaintiffs are therefore entitled to temporary, preliminary and permanent injunctions prohibiting Defendant from (1) marketing, manufacturing, or selling the Precision-designed airlock rotary feeders in any industry, including but not limited to the following:

- OEM blower truck industry
- OEM-Engineering industry
- Biomass Power generation industry
- Cement Manufacturing
- Coal-Fired power generation industry
- Food & Agriculture industry
- Pulp & Paper Industry
- Wood Processing Industry
- Mineral and Heavy Metal processing industry
- Plastics and Chemical processing industry
- OEM-Equipment industry

(2) further disclosing in any way Precision's Confidential Information and trade secrets concerning the airlock rotary feeders; (3) using the designs, pricing, manufacturing processes and other

COMPLAINT – Page 6 of 14

Confidential Information for the airlock rotary feeders developed by Precision without paying license fees, royalties or other compensation for such use; and (4) falsely claiming that Plaintiffs have misappropriated Defendants' intellectual property.

## CAUSES OF ACTION

### First Claim for Relief

### (Breach of the Meyer NDA)

16.     Plaintiffs reallege paragraphs 1 through 15.

17.     Among other promises in the Meyer NDA, Meyer promised to protect and to refrain from disclosing to any third party any of Precision's Confidential Information and that it would not use the Confidential Information for any purpose beyond that expressly described in the Meyer NDA (e.g. for evaluating a potential purchase of or investment in Precision).

18.     Plaintiffs performed their obligations under the Meyer NDA contract by providing Meyer access to Confidential Information, which included data concerning its processes, pricing, customers and competitors and including such Confidential Information about Precision's airlock rotary feeders.

19.     In addition to the breaches alleged above, Meyer further breached the Meyer NDA contract in at least the following particulars:

(a)     Disclosing the Confidential Information to third parties, including customers and competitors of Plaintiffs,

(b)     communicating and collaborating with Plaintiffs' customers and customers' agents to reverse engineer Precision's airlock rotary feeder,

(c)     providing Plaintiffs' customers with a Meyer-built replica of a Precision feeder and a complete set of replica engineering drawings for the Precision feeder, and

COMPLAINT – Page 7 of 14

(d)    utilizing the Confidential Information relating to materials, equipment and processes to manufacture Precision's feeders and sell the same in competition with Precision.

20.    The breach of the Meyer NDA by Meyer and its affiliated companies has proximately or legally caused Plaintiffs economic loss, damage and harm which is ongoing and increasing in an amount and Plaintiffs are entitled to both damages and injunctive and declaratory relief.

### Second Claim for Relief

### (Misappropriation of Trade Secrets)

21.    Plaintiffs reallege paragraphs 1 through 15.

22.    At all times relevant to the allegations of this Complaint, Plaintiffs were the owners of the Confidential Information which, as alleged above, included specific materials, products, techniques, processes, operations, formulae, product specifications, knowhow, compositions, inventions, discoveries, designs, sketches, drawings, cost, market data, pricing, customer data and other information relating to the airlock rotary feeders,  including those designated as Precision models "18x33," "16x25," "302," and "12x15".

23.    At the time of the misappropriation of Precision's Confidential Information, the same was unknown to anyone other than Plaintiffs (unless disclosed in strict confidence to a third party pursuant to a nondisclosure agreement), over which Plaintiffs exercised exclusive control, which had independent economic value because of such secrecy and Plaintiffs' control, and which Plaintiffs took extensive steps to protect from disclosure to third parties.

24.    Meyer improperly acquired, used, and disclosed Precision's Confidential Information to third parties.

COMPLAINT – Page 8 of 14

25.    Meyer's conduct violated federal and state statutes including, but not limited to, the Sherman Act (15 U.S.C. § 1, *et seq.*), the Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836), and ORS 646.461 *et seq*.

26.    As a direct, proximate and legal result of Meyer's misconduct, Plaintiffs have suffered economic loss, damage, injury, detriment and harm and Meyer has been unjustly enriched by its acts depriving Plaintiffs of control over the use and disclosure of Precision's IP and trade secrets; by depriving Plaintiffs of royalties, license fees or other compensation that would otherwise be payable by Meyer to Plaintiffs for acquisition, use or disclosure of Precision's IP, trade secrets and/or other Confidential Information; by diverting from Precision to itself sales of the Precision-designed and developed feeders; by defaming Plaintiffs to Precision's customers; and by wrongfully restraining, impairing and impeding Precision's ability to participate and compete in the market for such feeders.

27.    Meyer's misconduct was a substantial factor in the loss, damage, injury, detriment and harm visited upon Plaintiffs and in the unjust enrichment of Meyer.

28.    As a direct, proximate and legal result of such misappropriation of Precision's Confidential Information, Plaintiffs have suffered economic loss, damage and harm which is ongoing and increasing, in an amount that will be proven at trial.

### **Third Claim for Relief**

### (**Tortious Interference with Contract**)

29.    Plaintiffs reallege paragraphs 1 through 15.

30.    Plaintiffs and a business partner and customer, DHG, Inc. ("DHG") were parties to both a Memorandum of Understanding ("MOU") and an NDA, both of which required DHG to

COMPLAINT – Page 9 of 14

protect and refrain from using or disclosing to third parties any proprietary information, trade secrets and/or any other Confidential Information obtained from Precision.

31. Meyer and its affiliated companies knew or had reason to know of the existence and principal terms of the NDA and the MOU that restricted DHG from sharing or using Precision's Confidential Information. Following the disclosure of the Confidential Information to Meyer, Meyer colluded with DHG, both utilizing Precision's Confidential Information, to manufacture and sell Precision's rotary feeders which DHG then began purchasing from Meyer.

32. The misconduct of Meyer in violating the Meyer NDA, in collaborating with DHG to share and utilize Precision's Confidential Information and to enter into a seller-purchaser relationship with DHG and/or its affiliates ("DHG's Companies") using the pirated design, manufacturing processes, cost, price and other Confidential Information obtained from Plaintiffs, constitutes a tortious interference on the part of Meyer and its agents with both the MOU and the NDA contracts between Plaintiffs and DHG and DHG's Companies.

33. As a direct, proximate and legal result of such tortious interference with the MOU and the NDA, Plaintiffs have suffered economic loss, damage and harm which is ongoing and increasing in an amount to be proven at trial.

### Fifth Claim for Relief

**(Intentional Interference with Prospective Economic Relations**)

34. Plaintiffs reallege paragraphs 1 through 15.

35. At all times relevant to the allegations of this Complaint, there existed an economic relationship between Plaintiffs and DHG and DHG's Companies that, until Meyer's intervening and disruptive actions, included the high probability of future economic benefit to Plaintiffs.

COMPLAINT – Page 10 of 14

36.     By the time of its misconduct, Meyer had learned and knew of the relationship between Plaintiffs on the one hand and DHG and DHG's Companies on the other.

37.     Meyer and its affiliates knowingly committed wrongful acts, including, but not limited to those alleged above, with the intent to disrupt the economic relations between Plaintiffs and DHG and DHG's Companies so that Meyer could enjoy the benefits of a relationship with DHG and DHG's companies.

38.     At the time of committing the acts described above, Meyer either specifically intended to cause the disruption of the economic relations between Plaintiffs and DHG and DHG's Companies or knew that such disruption or interference with the relations was substantially certain to occur as a result of Meyer's actions.

39.     Severe disruption and interference in the business relationship between Plaintiffs on the one hand and DHG and DHG's Companies on the other did in fact occur as a result of Meyer's wrongful actions.

40.     As a direct, proximate and legal result of such intentional interference with Plaintiffs' economic relations with DHG and DHG's Companies, Plaintiffs have suffered economic loss, damage and harm which is ongoing and increasing in an amount that will be proven at trial.

### Sixth Claim for Relief

### (Fraud)

41.     Plaintiffs reallege paragraphs 1 through 15.

42.     Defendant Meyer represented to Plaintiffs that it had an interest in doing business with Plaintiffs and potentially purchasing Precision and that it would hold Plaintiffs' proprietary

COMPLAINT – Page 11 of 14

information including Precision's IP, trade secrets and other Confidential Information gathered while investigating a potential transaction with Plaintiffs, in strict confidence.

43.    In reality, Meyer had no intention of purchasing or investing in Precision and, instead, intended to use the pretense of interest in a potential transaction to obtain access to Plaintiffs' Confidential Information.

44.    Plaintiffs reasonably relied on the misrepresentations of Meyer and but for Meyer's misrepresentation, Plaintiffs would not have provided Meyer with any information related to its business.

45.    As a direct and proximate result of such intentional misrepresentations, Meyer obtained Precision's business information and damaged Precision as a result.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment and orders against Defendant as follows:

A.    For monetary damages awarded to Plaintiffs for any and all economic loss, damage, injury and/or harm proximately or legally caused to Plaintiffs by Meyer's conduct;

B.    For disgorgement or restitution by Meyer of any and all benefit obtained by Meyer from its wrongful conduct;

C.    Enjoining Meyer and its affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them from:  (1) marketing, manufacturing, or selling the Precision-designed airlock rotary feeders in any industry, including but not limited to the following:

- OEM blower truck industry
- OEM-Engineering industry
- Biomass Power generation industry
- Cement Manufacturing
- Coal-Fired power generation industry
- Food & Agriculture industry

COMPLAINT – Page 12 of 14

- Pulp & Paper Industry
- Wood Processing Industry
- Mineral and Heavy Metal processing industry
- Plastics and Chemical processing industry
- OEM-Equipment industry

(2) further disclosing in any way Precision's Confidential Information and trade secrets concerning the airlock rotary feeders; (3) using the designs, pricing, manufacturing processes and other Confidential Information for the airlock rotary feeders developed by Precision without paying license fees, royalties or other compensation for such use; and (4) falsely claiming that Plaintiffs have misappropriated Defendants' intellectual property.

D.    For an award of punitive or exemplary damages in an amount sufficient to punish Meyer and deter future wrongful conduct;

E.    For an order requiring Meyer and its affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in active concert with them to destroy and dispose of Precision's IP and trade secrets and all other Confidential Information obtained from Precision, including, but not limited to, all designs, programs, fixturing, drawings, and/or documentation that are associated with and/or derived from the reverse engineering of the Precision's rotary airlock feeder or other use of its Confidential Information;

F.    For an award to Plaintiffs' of reasonable attorney fees, costs and related expenses incurred in prosecution of this Complaint; and

G.    For such other and further relief as the Court deems just and proper.

/////

/////

/////

COMPLAINT – Page 13 of 14

## JURY DEMAND

Plaintiffs hereby request and demand trial by jury on all claims so triable.

DATED July 8, 2026.

HERSHNER HUNTER, LLP


By   */s/Todd R. Johnston*
     Todd R. Johnston, OSB 992913
     tjohnston@hershnerhunter.com
     Of Attorneys for Plaintiffs

## CONFIDENTIALITY AGREEMENT

This Confidentiality Agreement ("Agreement") is made as of _____May 7th_____, 2024 by and between **Project Rotary (Client #361)** (the, "Company") and __Charles Meyer - Wm. W. Meyer & Sons__ ("Recipient").

1.  Purpose. Crown Point Partners, LLC ("Crown Point") is acting as exclusive financial advisor for the Company and its equity holders in connection with a possible negotiated acquisition or other investment transaction between the Company and the Recipient (the "Transaction"), and the Company wishes to provide directly and to have Crown Point furnish certain proprietary information concerning the Company to Recipient for the sole purpose of facilitating Recipient's evaluation, negotiation, documentation or consummation of the Transaction (the "Purpose").

2.  Confidential Information. For purposes of this Agreement, the term "Confidential Information" means any and all information of a confidential nature disclosed to Recipient by or on behalf of the Company, orally, in writing or in any other medium, however documented (or not documented) and whether or not marked "Confidential." "Confidential Information" includes, without limitation, information regarding the Company's actual or proposed businesses; historical and projected financial information, budgets, services, products, trade secrets, techniques, processes, operations, formulae, product specifications, know-how, processes, compositions, inventions, discoveries, designs, sketches, drawings, samples, formats, marketing and manufacturing plans and materials, analyses, strategies, forecasts, research and development; concepts, ideas, names, addresses and any other characteristics, identifying information or aspects of the Company's existing or potential customers, employees, vendors or suppliers, this Agreement and its contents; or any information derived, summarized or extracted from any of the foregoing. "Confidential Information" shall not include any information that: (a) is or becomes available to the public other than as a consequence of a breach of this Agreement by Recipient or its Representatives (as defined below), or (b) Recipient or its Representatives received from a source not bound by obligations of confidentiality with respect thereto, or (c) Recipient or its Representatives developed independently without reliance upon the Confidential Information, or (d) is in Recipient's possession or in the possession of its Representatives prior to the date hereof on a non-confidential basis.

3.  Disclosure and Use Restrictions. Recipient hereby agrees to and to direct its Representatives to, hold in confidence and trust all Confidential Information and not to disclose or otherwise provide or transfer, directly or indirectly, any Confidential Information to any third party (except as permitted herein) without the prior written consent of the Company; provided, however, that Recipient may disclose Confidential Information to those of its affiliates and its and their respective principals, directors, officers, employees, attorneys, accountants, financial advisors, consultants and other advisors on a "need to know" basis (any of the foregoing that receive Confidential Information from or on behalf of Recipient, its "Representatives"), and then only to the extent necessary to effect the Purpose. Recipient further agrees that it and its Representatives may use the Confidential Information only in connection with the Purpose. Recipient agrees to direct its Representatives to comply with the terms of this Agreement applicable to its Representatives and further agrees to be responsible for any breach of the terms of this Agreement applicable to its Representatives by its Representatives, including their failure to follow any direction required to be given by Recipient under this Agreement. Recipient hereby agrees that, in the event it or its Representatives become subject to an order issued by any court or other governmental entity requiring Recipient or such Representatives to turn over any Confidential Information, it shall, to the extent legally permitted, give the Company prompt notice of such order and shall provide commercially reasonable cooperation to the Company in its efforts to protect the confidentiality of such information at the Company's expense and subject to compliance with all applicable laws and court orders. Recipient shall then be permitted to disclose only that portion of the Confidential Information that is legally required to be disclosed. Notwithstanding any other provision of this Agreement, no prior notice or other action shall be required in respect of any disclosure made to any banking, financial, accounting, securities or similar supervisory authority exercising its routine supervisory or audit functions, provided that such disclosure is made in the ordinary course and is not specific to the Company, the Transaction or the Confidential Information.

4.  Destruction of Confidential Information. If requested in writing by the Company or Crown Point, Recipient agrees to and to direct its Representatives to, promptly destroy all written Confidential Information received from or on behalf of the Company, including any and all copies or duplicates of such Confidential Information, and all summaries or extracts thereof in any medium prepared by or on behalf of Recipient. Upon written request by the Company or Crown Point, Recipient further agrees to deliver a written confirmation from a responsible representative of Recipient that it has fulfilled its obligations under this Section. Notwithstanding the foregoing, Recipient and its Representatives shall be entitled to retain any Confidential Information to the

Page **1** of **4**

EXHIBIT 1
Page 1 of 4

extent necessary to comply with any applicable legal, regulatory or compliance policies or procedures, including its and their standard data archival procedures, provided that such retained Confidential Information shall continue to be subject to the confidentiality obligations under the term of this Agreement, and nothing shall require the erasure, deletion, alteration or destruction of back-up tapes and other back-up media made in the ordinary course of business.

5.  <u>Non-Disclosure of Business Relationship.</u> In addition to the foregoing disclosure and use restrictions regarding Confidential Information, Recipient agrees that it will and will direct its Representatives to, keep strictly confidential and not, without the prior written consent of the Company, disclose to any third party (other than its Representatives) the existence or any aspect of any ongoing negotiations, discussions or business dealings between the Company and Recipient concerning a Transaction; provided, however, that Recipient may make a public announcement of such agreement (the form and substance of which shall have been approved by the Company, which approval shall not be unreasonably withheld) at such time as the parties complete a Transaction or at such earlier time as may be required under applicable securities laws. Except as required by law, Crown Point and the Company agree that they will, and will direct their respective representatives to, keep the existence and terms of any documents and other information (including without limitation any investment proposal letters and term sheets) provided by or on behalf of Recipient to Crown Point or the Company or any of their respective representatives in connection with the proposed Transaction strictly confidential and not disclose the same to any third parties in any manner whatsoever. Crown Point and the Company shall be responsible for any breach of this section by any of their respective representatives.

6.  <u>Non-Solicitation of Employees.</u> Recipient agrees that, for a period of one (1) year after the date hereof, it will not directly or indirectly through its affiliates who have received or been made aware of the Confidential Information solicit to hire, or hire, as an employee or consultant, any persons currently employed by the Company; provided, however, that nothing contained herein shall be construed to prohibit Recipient from (a) placing general advertisements for employment, or recruiting through employment agencies (so long as Recipient does not direct such agencies to solicit the Company's employees) any person (including any employee of the Company) as a result thereof, or (b) soliciting or hiring any person whose employment with the Company has been terminated at least 180 days prior to the commencement of any such solicitation or employment discussions between Recipient and such person.

7.  <u>Communication.</u> Recipient agrees to and to direct its Representatives acting on its behalf to, maintain all communications regarding the Transaction with the Company only through Crown Point or the controlling shareholder.

8.  <u>Crown Point.</u> Any agreement for Company's purchase shall recognize Crown Point's right to be paid by the Company or its shareholders.

9.  <u>No Assurances or Obligations.</u> Although the Company believes the Confidential Information is accurate, neither it nor Crown Point makes any representations or warranties as to its accuracy, completeness or fairness, and neither shall have any liability for any express or implied representations or omissions in the Confidential Information. Nothing contained in this Agreement shall be deemed to create a business relationship between the parties or obligate either party to enter into further discussions and/or agreements with the other except as provided in any definitive agreement with respect to a Transaction between the parties.

10.  <u>Irreparable Harm.</u> Recipient acknowledges that the Confidential Information and all rights thereto belong to the Company and nothing contained in this Agreement shall be construed as transferring any right or license to the Confidential Information to Recipient, except the limited right to review the Confidential Information in connection with the Purpose. Recipient further understands that, in the event it fails to comply with this Agreement, the Company may suffer irreparable harm for which it may not be adequately compensated by monetary damages alone. Recipient agrees that, in the event of any breach or threatened breach of this Agreement, the Company will be entitled to seek injunctive and/or other preliminary or equitable relief, in addition to any other remedies available at law and without the obligation to post a bond.

11.  <u>Jurisdiction.</u> Service of Process. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought in the courts of the State in which the Company's principal place of business is located and within the metropolitan area nearest such place of business, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue in connection therewith. Process in any such action or proceeding may be served on any party anywhere. Recipient hereby waives any requirement that the Company proves the economic value of any Confidential Information or posts a bond or other security in connection with the enforcement of its rights hereunder.

Page **2** of **4**

EXHIBIT 1
Page 2 of 4

12. <u>Miscellaneous.</u> The validity, interpretation, construction and enforcement of this Agreement shall be governed by the laws of the State in which the Company's principal place of business is located. This Agreement contains the entire understanding between the parties relating to this subject matter and supersedes all oral or written agreements between them with respect thereto, and no previous written or oral understandings have been or shall be relied upon. The failure of any party in any one or more instances to insist upon strict performance of any terms or provisions of this Agreement, or to exercise any option herein conferred, shall not be construed as a waiver or relinquishment to any extent of the right to assert or rely upon any such terms, provisions or options on any future occasion. To the extent any provision of this Agreement may be deemed to be unenforceable, such unenforceability shall not affect any other provision hereof. This Agreement shall be binding upon the successors and permitted assigns of the parties hereto, but neither of the parties hereto shall assign this Agreement without prior written consent of the other party. No amendment, modification or waiver of any provision of this Agreement will be effective unless and until it is reduced to writing and signed by all parties.

13. <u>Term.</u> This Agreement and all rights and obligations of the parties hereunder shall terminate on the earlier of (i) the date of entry into of a definitive agreement regarding the Transaction with the Recipient, or (ii) two (2) years from the date set forth below provided, however, with respect to Confidential Information that constitutes a trade secret under the Uniform trade Secrets Act, the obligations under Section 3 hereof shall continue so long as such Confidential Information remains a trade secret under the Uniform Trade Secrets Act.

14. <u>Common Interest; Privileges</u>. The parties to this Agreement share a common legal and commercial interest in the Confidential Information that is and remains subject to all applicable privileges, including attorney-client privilege, anticipation of litigation privilege, work product privilege and privilege in respect of "without prejudice" communications.  No waiver of any privilege is implied or intended by the disclosure of Confidential Information to any person pursuant to the terms of this Agreement.

15. <u>Miscellaneous.</u> This Agreement may be executed in two or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, shall be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronic mail in .pdf or similar format shall constitute effective execution and delivery of this Agreement as to the parties.  For purposes of this Agreement any reference to "written" or "in writing" shall be deemed to include correspondence by signed letter or facsimile or by e-mail.

IN WITNESS WHEREOF, the parties have caused this Confidentiality Agreement to be executed on __May 7th_____, 2024.

Client:    **Project Rotary - Client #361**
By:        Crown Point Partners, LLC, as Exclusive Representative

_____
Rodger Adams, Managing Partner

**Accepted and agreed to as of the date above:**

<u>RECIPIENT</u>

Company Name: __Wm. W. Meyer & Sons_____

Signature: _____

Name:       Charles Meyer

Title:        CEO

Complete Address:       1700 Franklin Blvd

Telephone:       (847) 918-8169

Email Address:    cmeyer@wmwmeyer.com

Page **3** of **4**

EXHIBIT 1
Page 3 of 4

<u>COMPANY</u>

Page **4** of **4**

Company Name: ___Precision Machine & Manufacturing, Inc.___

Signature: ___*J. C. Blanco*___

Name:  Jose Blanco

Title:  Manager, Authorized Signatory

EXHIBIT 1
Page 4 of 4